Katie Alice RIPSTRA, Appellant

v.

The STATE of Texas, Appellee

NO. 14–15–00842–CR, NO. 14–15–00843–CR

Court of Appeals of Texas, Houston (14th Dist.).

Opinion filed December 29, 2016.

Discretionary Review Refused March 1, 2017

Hattie Sewell Shannon, Bellaire, TX, for Appellant.

Melissa H. Stryker, Houston, TX, for State.

Panel consists of Justices Jamison, McCally, and Wise.

## OPINION

Martha Hill Jamison Justice

In four issues, Katie Alice Ripstra appeals her two convictions for felony injury to a child. She challenges (1) the legal sufficiency of the evidence in support of the jury's guilty verdicts; (2) the trial court's denial of her motion to exclude statements made during voir dire and motion to suppress statements she made to her child's guardian ad litem; (3) the trial court's admission of her Facebook posts; and (4) the trial court's exclusion of certain expert testimony. We affirm.

### *Background*

Appellant was employed as a pediatric nurse for Texas Children's Hospital. Her daughter, Rachel, was born in August 2009.[1] By October, appellant began reporting to Rachel's pediatrician that Rachel was having acid reflux and spitting up her milk. As these problems purportedly continued, in February 2010, Rachel's pediatrician referred Rachel to a pediatric gastroenterologist, Bruno Chumpitazi. Chumpitazi increased Rachel's reflux medication and put her on a milk-protein allergy diet. Appellant reported that Rachel continued to vomit and often had diarrhea. Thus, Chumpitazi put Rachel on more medications, instituted additional dietary measures, and began performing diagnostic procedures on Rachel, including endoscopies, colonoscopies, and biopsies. These tests did not reveal a medical explanation consistent with the extent of Rachel's symptoms, so Chumpitazi ordered more tests, including blood, stool, and allergy tests.

In April 2011, Chumpitazi was concerned about Rachel's poor weight gain and placed a nasogastric feeding tube in her nose, which ran down her esophagus into her stomach, through which she received medicine and formula to improve her nutritional intake. Appellant continued to report that Rachel was vomiting and having diarrhea and able to tolerate very little nutritional intake except through the nasogastric tube. In November 2011, Rachel underwent surgery to have a gastronomy button and feeding tube inserted directly into her stomach to deliver nutrition. Within approximately 48 hours of the surgery, appellant reported that Rachel's vomiting had increased. Finding these symptoms unusual and troubling, Chumpitazi ordered another surgery for Rachel to receive a central line catheter through a large vein in her chest that would provide an access point for the delivery of medication and "total parenteral nutrition" intravenously.[2]

In January 2012, in response to appellant's report that the vomiting was continuing, Chumpitazi ordered Rachel to be fitted with a feeding tube placed directly into the stomach that extended into the small intestine to bypass the stomach. The goal with was to deliver nutrition into the small intestine, so that the vomiting would

---

1. We identify the complainant by a pseudonym to protect her identity.

2. With total parenteral nutrition, the patient receives nutrition through her veins as opposed to through her gastrointestinal tract.

stop. Despite these interventions, appellant still reported that Rachel was vomiting, having diarrhea, and developing fevers at home.

Over the course of Rachel's treatment, Chumpitazi conducted extensive testing to determine a medical explanation for Rachel's continuing symptoms, but Chumpitazi was unable to ascertain the cause. In February 2013, Chumpitazi met with appellant and recommended that Rachel resume regular feedings in lieu of receiving nutrition intravenously and through feeding tubes because Rachel was not receiving any benefit from her treatments and the treatments put her at risk. Appellant disagreed, and Chumpitazi referred Rachel to another gastroenterologist at Texas Children's, Eric Chiou.

Rachel was admitted to the hospital numerous times while she was seeing both Chumpitazi and Chiou. During her hospital stays, she developed infections from multiple types of bacteria introduced into her central line catheter, which Chumpitazi described as "extremely rare."

Like Chumpitazi, Chiou could not find a medical explanation for Rachel's symptoms. Not only were Rachel's symptoms worsening, but Rachel was experiencing (1) sudden and inexplicable drops in her hemoglobin levels from rapidly losing large amounts of blood for which she received transfusions; (2) numerous complications with her feeding tube; (3) the aforementioned central line catheter infections; and (4) episodes of severe hypernatremia, which is a dangerously high level of sodium in the bloodstream. Rachel was hospitalized repeatedly because of these issues and underwent numerous medical treatments.

By June 2013, Chiou began to suspect medical child abuse. He met with Marcella Donaruma, a pediatrician and specialist in medical child abuse at Texas Children's. She agreed to consult on the case. During this time, Rachel was repeatedly hospitalized. In August 2013, one day after Rachel was discharged from the hospital in a healthy condition, appellant brought Rachel to Texas Children's emergency room with an extremely elevated sodium level. Rachel was admitted and transferred to the intensive care unit. During this hospitalization, hospital staff, working with Child Protective Services, placed Rachel in a "therapeutic separation," whereby appellant was kept away from Rachel. Rachel quickly recovered—her sodium and blood levels stabilized, and she was able to eat solid foods and no longer needed the central line catheter or feeding tubes. Based on the results of the therapeutic separation and Donaruma's review of the medical records, Donaruma concluded that Rachel had suffered from medical child abuse.

Appellant was charged with two felony offenses of intentionally or knowingly causing serious bodily injury to a child. After the jury found her guilty, it assessed punishment at 20 years' confinement for each offense, to run concurrently.

### Discussion

Appellant brings four issues. She challenges the legal sufficiency of the evidence in support of the jury's guilty verdicts and complains that the trial court abused its discretion in (1) not excluding the State's discussion in voir dire of Munchausen by proxy also known as factitious disorder by proxy, appellant's Facebook posts offered by the State, and statements made by appellant to Rachel's guardian ad litem; and (2) in excluding testimony from the State's expert witness regarding an alleged prior misdiagnosis in a different case.[3]

## I. Jury's Verdicts Supported by Legally Sufficient Evidence

We address first appellant's fourth issue in which she challenges the legal sufficiency of the evidence in support of the jury's guilty findings against her for felony injury to a child. Appellant argues there is no evidence that she administered sodium to Rachel and that, instead, Rachel (1) suffered from dehydration and not salt poisoning; (2) was misdiagnosed as having suffered medical child abuse; and (3) was "over-medicalized," which is why she got better after she was separated from appellant and her medical treatments stopped.

 When reviewing sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences therefrom, whether any rational factfinder could have found the elements of the offense beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). We do not sit as a thirteenth juror and may not substitute our judgment for that of the factfinder by reevaluating the weight and credibility of the evidence. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Rather, we defer to the factfinder to fairly resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Id.* This standard applies equally to both circumstantial and direct evidence. *Id.* Each fact need not point directly and independently to the appellant's guilt, as long as the cumulative effect of all incriminating facts is sufficient to support the conviction. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

As to each charged offense, the State was required to prove that appellant "intentionally, knowingly, recklessly, or with criminal negligence" caused serious bodily injury to Rachel. *See* Tex. Penal Code § 22.04. Appellant was charged with committing these offenses by "introducing sodium into [Rachel's] body" and "placing a catheter in [Rachel's] vein" as the primary actor or a criminally responsible party to the offense.[4]

### A. Challenges Related to Salt Poisoning

 Appellant argues that no evidence supports the jury's finding that she administered sodium to Rachel. Appellant further contends that she established through expert testimony that Rachel suffered from dehydration and not salt poisoning.

The State presented evidence that Rachel had been released from the hospital on August 5, 2013 in a healthy condition. Her sodium level was within the normal range at that time. She left the hospital with appellant. By 6 a.m. the next morning, Rachel's sodium level became "extremely high," and appellant took her back to the emergency room. Rachel was

---

3. Munchausen by proxy, or factitious disorder by proxy, is referred to in the medical community as medical child abuse and involves subjecting another person, often a child, to unnecessary medical treatments by either fabricating an illness or intentionally making the person sick.

4. Appellant does not provide any analysis to support an argument that no evidence supports the jury's finding that she "place[d] a catheter in [Rachel's] vein." To the extent that appellant asserts such an argument, we conclude that it is inadequately briefed. *See* Tex. R. App. P. 38.1 (requiring an appellant's brief to contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record).

critically ill and was admitted into the intensive care unit. Donaruma testified that Rachel "could have died." Donaruma concluded that the medical explanation for the "incredibly rapid" rise in Rachel's sodium level was "salt poisoning." Appellant was the only person who had been with Rachel from the time she was discharged from the hospital until the time appellant took Rachel to the hospital.

Appellant presented expert testimony that, based upon a review of her medical records, Rachel suffered from dehydration and not salt poisoning. The State's experts testified that Rachel's symptoms were not consistent with dehydration, given Rachel's excessive urination, unusual emission of fluids from her feeding tube, and the "[e]xtremely significant discrepancy" between what Rachel should have weighed upon admission to the hospital and her actual weight.[5] The State's experts concluded that the only possible explanation for Rachel's condition was the administration of an excessive amount of sodium to Rachel. Moreover, upon the therapeutic separation from appellant, Rachel's sodium level returned to normal, and Rachel did not again experience a rapid increase in her sodium level. Even though appellant's expert testified that Rachel suffered from dehydration as opposed to salt poisoning, the jury was free to resolve the conflict in the expert testimony in favor of the State.[6] *See Stanley v. State,* 470 S.W.3d 664, 672 (Tex. App.–Dallas 2015, no pet.).

### B. Evidence Related to Misdiagnosis and "Over–Medicalization"

■ Appellant argues that she established at trial that Rachel was misdiag-

nosed with medical child abuse and had been "over-medicalized" by her doctors. In other words, the doctors had over-prescribed remedies that "either hurt [Rachel] or ... made [her] more sick," and she either got better when the doctors stopped treatment or got better on her own. Appellant presented expert testimony to support these defenses. Her experts testified, among other things, that many, if not all, of Rachel's symptoms were consistent with mitochondrial disease and Rachel's condition improved because the "over-medicalization" was stopped.

The jury was entitled to take the following evidence into account in reaching its verdicts. Appellant's expert did not make a definitive diagnosis of mitochondrial disease. He did not indicate that any invasive treatment Rachel received would have been contraindicated by such a diagnosis, for which he testified there is "not really a cure." The jury also reasonably could have concluded that appellant's expert testimony indicating that Rachel possibly had mitochondrial disease and was over-medicalized was contradictory—either Rachel needed treatment for mitochondrial disease, which her doctors were administering, or her symptoms were attributable to over-treatment.

The State's experts, on the other hand, presented evidence that Rachel's symptoms were not caused by mitochondrial disease or over-medicalization but instead were caused by medical child abuse:

- Rachel suffered many complications with her central line catheter, including unusual damage to the line, which caused the line to leak, and several

---

**5.** The State's expert testified the hospital weighed Rachel 24 hours earlier, at discharge, when her sodium levels were normal. When she was readmitted to the hospital and began receiving fluids, her weight was about the same. According to the expert, had Rachel

been dehydrated, her weight would have been significantly less.

**6.** Appellant has not challenged the reliability of the State's expert testimony.

infections that were suspicious based on their timing, frequently occurring shortly after hospital staff informed appellant that Rachel would be discharged from the hospital. The types and quantities of bacteria discovered to be causing the infections were extremely rare.

- Rachel's feeding tube inexplicably had moved out of place many times.
- Rachel's hemoglobin levels suddenly and inexplicably dropped several times, which could be explained only by someone withdrawing blood from Rachel's central line.
- Rachel experienced several episodes of hypernatremia, a dangerously high level of sodium in the bloodstream, which could only be explained by salt poisoning.
- After a therapeutic separation from her mother, Rachel recovered completely.
- After reviewing Rachel's medical history over several years, Donaruma concluded that Rachel had suffered medical child abuse at the hands of appellant.

■ The jury, as factfinder, was free to believe or disbelieve, in whole or in part, any or all of the expert testimony. *See Jones v. State*, 235 S.W.3d 783, 786 (Tex. Crim. App. 2007). Viewing the evidence in the light most favorable to the jury's verdict, we conclude that the jury's finding that appellant caused serious bodily injury to Rachel by introducing sodium into her body and the jury's rejection of appellant's misdiagnosis and over-medicalization theories were supported by legally sufficient evidence. We overrule appellant's fourth issue.

## II. No Abuse of Discretion in Allowing References to Munchausen by Proxy

### A. During Voir Dire

■ In her first issue, appellant complains that the trial court allowed the State to question the jury panel on the disorder "Munchausen by proxy" during voir dire. Appellant asserts that such questions were irrelevant because appellant had not been diagnosed with the disorder. Before voir dire began, defense counsel made an oral motion to prohibit the State from using the terms "Munchausen by proxy" or "factitious disorder by proxy."[7] The trial court overruled the oral motion.[8] Defense counsel renewed the objection to the State's reference to the disorder during voir dire.

■ As an initial matter, we note that a motion in limine normally preserves nothing for appellate review because it merely requests that the opposing party not be permitted to raise certain issues before a hearing has been held outside the presence of the jury to determine admissibility of those issues. *Geuder v. State*, 115 S.W.3d 11, 14–15 (Tex. Crim. App. 2003). Presuming without deciding that appellant's oral motion preserved this issue for our review, we nevertheless conclude that

---

7. Defense counsel stated: "I wanted to make a motion—an oral Motion in Limine with regard to any reference to the term '[M]unchausen by proxy' or 'factitious disorder by proxy,' that those things not be stated in the presence of the jury panel without that being ruled upon as being proper."

8. Defense counsel also had filed a "Motion to Exclude All Evidence and All Testimony Regarding Attention Seeking a/k/a Factitious Disorder, alternatively Motion in Limine." After the trial court denied the oral motion, defense counsel mentioned the written motion but did not ask for a ruling on it. Defense counsel stated, "You've ruled on the oral Motion in Limine. We have it in written form as well. It's going to come up again and again." The trial judge responded, "I know," but did not rule on the written motion.

the trial court did not abuse its discretion in allowing the State to question the jury panel regarding Munchausen by proxy.

 The trial court has broad discretion over the process of selecting a jury. *Barajas v. State*, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002). We leave to the trial court's discretion the propriety of a particular question that we will not disturb absent an abuse of that discretion. *Id.* A trial court abuses its discretion only when a proper question about a proper area of inquiry is prohibited. *Id.* A question is proper if it seeks to discover a panel member's views on an issue applicable to the case. *Id.* An otherwise proper question is impermissible, however, if it attempts to commit the panel member to a particular verdict based on particular facts. *Id.*

Defense counsel objected on the basis that the State's references to the disorder were not relevant because appellant had not been diagnosed with "medical child abuse, previously factitious disorder, previously [M]unchausen." State's counsel argued:

> [W]e're just going to be asking the jurors for what they've heard in the community. And it is relevant. It is what this case is about. It is the crux of the case. And that is a common term that I think most society is going to know it by. They're not going to know it by medical child abuse.

State's counsel also noted, "[I]t is voir dire. The purpose is to get [the panel members'] thoughts and feelings, what they know, do they have any preconceived notions about the issues that are going to come up in trial." The trial court overruled the objection, concluding "I think they're entitled to ask people if they know what [Munchausen by proxy] is."

During voir dire, State's counsel generally asked the panel if they had heard of Munchausen by proxy and whether the panel members thought it was a form of child abuse. These questions were proper because they sought to discover the panel member's views on an issue applicable to the case—whether appellant abused her child by fabricating an illness or intentionally making her sick. The questions were general and did not attempt to commit the panel members to a particular verdict based on particular facts. State's counsel did not represent to the panel that appellant had been diagnosed with Munchausen by proxy or otherwise reveal facts about appellant's medical condition. We conclude that the trial court did not abuse its discretion in allowing the State to ask these questions.

### B. Through Facebook Posts

 Appellant also argues in her first issue that the State's voir dire questions about Munchausen by proxy "opened the door to allowing ... [Facebook posts admitted at trial to] sway the jury." The State introduced Facebook posts made by appellant and her Facebook friends about Rachel's condition to support the State's theory that appellant was abusing Rachel to get attention—in other words, the State contended that appellant sought the affirmation of her friends on Facebook whenever Rachel had health problems. Defense counsel objected to all of the Facebook posts as hearsay. The trial court admitted only the statements made by appellant on Facebook, not statements made by appellant's friends.

 On appeal, appellant argues that the admission of her Facebook posts "allowed prejudicial and unsupported testimony and evidence in front of the jury" to advance the State's theory that appellant had Munchausen by proxy. Appellant contends that the State failed to present evidence of a "medical or scientific founda-

tion" to support a diagnosis of Munchausen by proxy and thus the trial court abused its discretion in admitting the appellant's Facebook posts, which advanced the State's theory. Appellant did not object to the admission of the Facebook posts on these grounds at trial. To preserve error, a party must object and state the grounds for the objection with enough specificity to make the trial judge aware of the complaint, unless the specific grounds were apparent from the context. Tex. R. App. P. 33.1. The objection must be sufficiently clear to give the judge and opposing counsel an opportunity to address and, if necessary, correct the purported error. *Thomas v. State*, 505 S.W.3d 916, 924 (Tex. Crim. App. 2016). If a trial objection does not comport with arguments on appeal, error has not been preserved. *Id.* We conclude that appellant has not preserved error on her complaint that the Facebook posts were prejudicial or improperly advanced the State's theory.

■■■■ Appellant also argues that appellant's Facebook posts are hearsay. Texas Rule of Evidence 801(e)(2) provides that a statement is not hearsay if it is offered against a party and is a party's own statement. *Williams v. State*, 402 S.W.3d 425, 438 (Tex. App.–Houston [14th Dist.] 2013, pet. ref'd). The only requirements for admissibility of an admission of a party opponent under Rule 801(e)(2) is that the admission is the opponent's own statement and that it is offered against her. *Id.* The State offered appellant's own statements that she made on Facebook against her.[9] Although we have not previously addressed this issue, we conclude that the trial court did not err in admitting appellant's Facebook posts as admissions of a

party opponent. *Cf. Jackson v. State*, No. 05–14–00274–CR, 2015 WL 3797806, at *4 n.4 (Tex. App.–Dallas 2015, no pet.) (mem. op., not designated for publication) (concluding that the appellant's text messages were not hearsay because they were admissions of a party opponent); *see also* Steven Goode, *The Admissibility of Electronic Evidence*, 29 Rev. Litig. 1, 7 (Fall 2009). Accordingly, the statements are not hearsay.

We overrule appellant's first issue.

### III. Denial of Motion to Suppress Not Erroneous Due to Lack of Custodial Interrogation

■■■■ In her second issue, appellant contends that the trial court erred in denying her motion to suppress statements made to Rachel's court-appointed guardian ad litem. According to appellant, her statements are inadmissible because she did not receive warnings under Texas Code of Criminal Procedure article 38.22 and *Miranda v. Arizona. See* Tex. Code Crim. Proc. art. 38.22 (establishing that no statement of an accused made as a result of custodial interrogation shall be admissible against her at trial unless a recording is made of the statement and statutory warnings are given); *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (establishing that subjecting an individual to custodial questioning without first warning her of Fifth Amendment rights against self-incrimination and obtaining a voluntary waiver of those rights renders any evidence obtained as part of that questioning inadmissible at trial). Appellant also complains that her statements are inadmissible under Texas Code of Criminal Procedure article 38.23. Tex. Code Crim. Proc. art. 38.23 (establishing that evidence obtained in violation of Texas

---

9. The trial judge sustained appellant's objection to statements made by others on the Facebook posts. Those statements were redacted.

or United States Constitutions or statutes is inadmissible at trial).

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard. *State v. Kerwick*, 393 S.W.3d 270, 273 (Tex. Crim. App. 2013). The trial court's determinations of historical facts and mixed questions of law and fact that rely on credibility are granted almost total deference when supported by the record. *Id.* But when mixed questions of law and fact do not depend on the evaluation of credibility and demeanor, we review the trial court's ruling de novo. *Id.* When, as in this case, the trial judge does not make formal findings of fact, we uphold the trial court's ruling on any theory of law applicable to the case and presume the court made implicit findings in support of its ruling if those findings are supported by the record. *State v. Ross*, 32 S.W.3d 853, 855–56 (Tex. Crim. App. 2000).

Duane King represented Rachel as her guardian ad litem in a separate proceeding filed in juvenile district court involving the Texas Department of Family and Protective Services (C.P.S.). As Rachel's guardian ad litem, King investigated Rachel's case and made recommendations to the juvenile court judge regarding custody of Rachel. As part of his investigation, King interviewed appellant approximately four months before she was arrested for the offenses in this case.[10] The interview occurred in defense counsel's office in the presence of two of appellant's attorneys and a private investigator whom the juvenile court had authorized King to hire. The interview was not recorded.

10. Appellant had been charged with the offenses approximately two months before the interview.

11. King testified at trial that his role was to help the juvenile district court decide what was in Rachel's best interest with regard to custody in the juvenile court proceeding. *See*

At trial, defense counsel objected to King's testimony regarding statements made by appellant during the interview on the basis that

based on [King's] capacity as a child advocate and as a guardian ad litem, ... I think he would fit under the umbrella of a State agent .... [W]e think that ... he shouldn't be allowed to testify as to anything that was said to him in my office without her having been properly warned ....

Without citing any authority, appellant argues that King was a State agent and that the trial court erred in failing to exclude the statements appellant made when King interviewed her. "*Miranda* ... generally applies only to questioning by law enforcement officers or their agents." *Wilkerson v. State*, 173 S.W.3d 521, 527 (Tex. Crim. App. 2005). The "label [State agent] does not, by itself, make the person an 'agent of the State' for the purpose of defining 'custodial interrogation.'" *Id.* Appellant had the burden to prove that her statements were the product of custodial interrogation by an agent for law enforcement. *See Id.* at 532. To be an agent for law enforcement for the purposes of custodial interrogation, King had to interview appellant "for the primary purpose of gathering evidence or statements to be used in a later criminal proceeding against" appellant. *See Id.* at 531. Appellant has not demonstrated that King did so.[11]

Presuming for purposes of our analysis, however, that appellant had dem-

*Wilkerson*, 173 S.W.3d at 531–32 (concluding that a C.P.S. caseworker was not acting as State agent for purposes of custodial interrogation when the caseworker interviewed the defendant in jail to assess whether to remove a child from the defendant's home).

onstrated King was an agent for law enforcement, appellant voluntarily met with King and participated in the interview with her attorneys present. If statements do not derive from custodial interrogation, the requirements of *Miranda* and article 38.22 do not apply. *Gregory v. State*, 56 S.W.3d 164, 174 (Tex. App.–Houston [14th Dist.] 2001, pet. dism'd). A non-custodial, voluntary, oral statement is admissible at trial. *Id.* (citing Tex. Code Crim. Proc. art. 38.22, § 5). In that connection, article 38.33, which applies only to evidence obtained in violation of Texas or federal constitutional or statutory law, likewise would not apply to statements obtained lawfully when an accused is not in custody. *See* Tex. Code Crim. Proc. art. 38.23.

■ A person is in custody if, under the totality of the circumstances, a reasonable person would believe her freedom of movement was restrained to the degree associated with a formal arrest. *Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996); *Turner v. State*, 252 S.W.3d 571, 576 (Tex. App.–Houston [14th Dist.] 2008, pet. ref'd). The Court of Criminal Appeals has established four general situations that may constitute custody: (1) if the suspect is physically deprived of her freedom in any significant way; (2) if a law enforcement officer tells the suspect not to leave; (3) if a law enforcement officer creates a situation that would lead a reasonable person to believe that her freedom of movement has been significantly restricted; and (4) there is probable cause to arrest the suspect and the law enforcement officer did not tell the suspect she is free to leave. *Gardner v. State*, 306 S.W.3d 274, 294 (Tex. Crim. App. 2009); *Matthews v. State*, 513 S.W.3d 45, 63 (Tex. App.–Houston [14th Dist.] Nov. 6, 2016, pet. denied).

Appellant does not assert that she was in custody at the time of the interview, and the circumstances do not support a conclusion that a reasonable person would believe her movement was restrained to the degree associated with a formal arrest when she voluntarily met with an investigator in her attorney's office. Accordingly, we conclude that the trial court did not err in denying her motion to suppress. We overrule appellant's second issue.

## IV. No Abuse of Discretion in Excluding Evidence Regarding Alleged Misdiagnosis in Different Case

■ In her third issue, appellant argues that the trial court abused its discretion in excluding proffered evidence regarding an alleged prior misdiagnosis of medical child abuse by the State's expert, Marcella Donaruma. Defense counsel asked Donaruma whether she had "ever recommended C.P.S. intervention in a case that later turned out to be mitochondrial disease." State's counsel objected on the basis of relevance, and the trial court sustained the objection.

■ We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *De La Paz v. State*, 279 S.W.3d 336, 343–44 (Tex. Crim. App. 2009). As long as the trial court's ruling falls within the zone of reasonable disagreement, we will affirm that decision. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003).

■ Evidence is relevant if it has any tendency to make a fact that is of consequence in determining the action more or less probable than it would be without the evidence. Tex. R. Evid. 401. Relevant evidence is generally admissible. *See* Tex. R.

Evid. 402; *Erazo v. State*, 144 S.W.3d 487, 499 (Tex. Crim. App. 2004). Irrelevant evidence is inadmissible. Tex. R. Evid. 402. Under Rule 403, a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. In conducting a rule 403 analysis, courts must balance: (1) the inherent probative force of the proffered evidence and (2) the proponent's need for that evidence, against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency to confuse or distract the jury from the main issues, (5) any tendency to be given undue weight by the jury, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or be cumulative of other evidence.[12] *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006); *Buzby v. State*, 480 S.W.3d 113, 116 (Tex. App.–Houston [14th Dist.] 2015, no pet.). Appellant provides no analysis of the Rule 403 balancing test, other than to list the factors and make the bare assertion that the proffered evidence "would have [been] more probative than prejudicial in Appellant's case."

Defense counsel made the following offer of proof in relevant part:

- Donaruma previously had been sued in a medical malpractice case. The underlying allegation was that Donaruma had referred a child to C.P.S. based on an erroneous lab result.
- Appellant's counsel asked Donaruma, "[T]he child was later diagnosed as having mitochondrial disease; isn't that right?" Donaruma responded, "I have no idea what happened to her."
- Donaruma testified that she referred the child to C.P.S. for possible abuse "because there were positive substances found in [the] child's blood that shouldn't be there." She denied that the lab made a mistake.

Appellant's defense at trial was that Rachel had been misdiagnosed with medical child abuse when she actually had mitochondrial disease. Defense counsel argued that the proffered evidence revealed that Donaruma was biased because she could be subjected to "potential malpractice liability for a misdiagnosis of medical child abuse" as to Rachel if appellant was not convicted.[13] Defense counsel, however, did not establish an exception to the immunity provided for C.P.S. referrals that would expose Donaruma to "potential malpractice liability.[14] Moreover, appellant has not demonstrated how the excluded testimony would advance her theory that Donaruma misdiagnosed Rachel with medical child

12. Although the trial court did not expressly conduct a Rule 403 balancing test in excluding the evidence, we will affirm a trial court's ruling on any theory of law applicable to the case, even if the trial court did not purport to rely on that theory. *Buzby v. State*, 480 S.W.3d 113, 116 n.3 (Tex. App.–Houston [14th Dist.] 2015, no pet.).

13. Defense counsel asserted that Donaruma was biased because she would be "exonerated from any potential medical malpractice" by "having [appellant] convicted of a crime related to [Donaruma's] diagnosis."

14. Under Family Code section 261.106:

A person acting in good faith who reports or assists in the investigation of a report of alleged child abuse or neglect or who testifies or otherwise participates in a judicial proceeding arising from a report, petition, or investigation of alleged child abuse or neglect is immune from civil or criminal liability that might otherwise be incurred or imposed.

Tex. Fam. Code § 261.106(a). Defense counsel argued that Donaruma would not be immune from liability under section 261.106 if she had misdiagnosed Rachel. Appellant cites no authority establishing such an exception, and we have found none.

abuse. Appellant did not offer any evidence that Donaruma had misdiagnosed the child in the other case.[15]

The proffered testimony was, at best, marginally relevant. The trial court did not prevent appellant from advancing her theory that Rachel was misdiagnosed with medical child abuse. Under these facts, the trial court reasonably could have concluded that the probative value of the proffered evidence was substantially outweighed by a danger that the jury would have been confused or distracted from the main issue in this case—whether, under these facts, appellant medically abused Rachel. We overrule appellant's third issue.

### Conclusion

We affirm the judgment of the trial court.

---

**15.** Defense counsel stated that the father of the child in the other case was prepared to testify that Donaruma had misdiagnosed his daughter. However, defense counsel did not call the father as a witness.