

# NUMBER 13-18-00374-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

MARIA LUISA CUSI OLIVAREZ,                                    Appellant,

v.

THE STATE OF TEXAS,                                          Appellee.

### On appeal from the 370th District Court
### of Hidalgo County, Texas.

# MEMORANDUM OPINION
### Before Justices Benavides, Hinojosa, and Perkes
### Memorandum Opinion by Justice Benavides

By four issues, appellant Maria Luisa Olivarez challenges her conviction for continuous sexual abuse of a child. *See* TEX. PENAL CODE ANN. § 22.021(f). Olivarez argues that: (1) the evidence is insufficient to support her conviction; (2) the jury charge denied her a fair and impartial trial; (3) the trial court abused its discretion by admitting evidence; and (4) her counsel provided ineffective assistance by failing to request a

mistake of fact instruction in the jury charge.   We affirm.

## I.   BACKGROUND

Olivarez was indicted in July 2015 for two counts of continuous sexual abuse of her daughters: (1) G.D.S.[1] during the period from February 13, 2014 through February 13, 2015 and (2) C.D.S. during the same period.   G.D.S. and C.D.S. were born in 2005 and 2006.   Olivarez and the girls' father Jose Luis De Santiago were divorced in 2009. Olivarez was in a long-term relationship with Bruno Chapa, her co-defendant.   Olivarez was charged as a party to the offense for her part in assisting Chapa and failing to protect her children.   She and Chapa were tried together.

On February 15, 2016, C.D.S., who was nine years' old, confided in her father's new wife Alma De Santiago that Chapa touched her inappropriately.   Later that afternoon, Alma told Jose what C.D.S. told her.   They reported the abuse to the McAllen Police Department and to the Hidalgo County Sheriff's Office (HCSO) which investigated the allegations.   Jose telephoned Olivarez to tell her about C.D.S.'s allegations.

On February 18, 2016, Alma met with Olivarez to prepare a notarized letter to allow the girls to live with Alma and Jose and also to transfer their medical and public benefits to Alma and Jose.   During that meeting, Alma recorded a portion of their conversation. While they were talking, Olivarez admitted that G.D.S. had told her that Chapa was molesting her and she had confronted Chapa.   According to Olivarez, Chapa responded, "What do you mean molesting? . . . No, I'm not doing anything to the girl."   Olivarez responded, "Okay, I told him, you know what?   This is over."   During the same

---

[1] We use initials to protect the identities of the minors.   *See* TEX. R. APP. P. 9.7.

2

conversation, Alma accused Olivarez of knowing about the abuse. Olivarez responded, "I know what's coming is very heavy—there's things coming—I know there's heavier things coming for me. Maybe I'll go—maybe I'll spend time locked up too, I don't know." When Olivarez insisted that she had broken up with Chapa, Alma accused her of taking the girls to him the previous Friday, to which Olivarez responded, "I'm telling you the truth. I haven't taken the little girls. . . . On Friday I didn't take the girls to him." Alma later provided Investigator Steve Moyar with the HCSO the recorded conversation she made with Olivarez on February 18, 2016.

Investigator Moyar testified that he was assigned to investigate the allegations on February 16, 2016. He observed the girls' interviews which took place on February 24, 2016, at the children's advocacy center and scheduled the sexual assault examinations for the same day. During the interviews, each of the girls separately described an event during which their mother kept them in a bedroom at Chapa's apartment on Owassa Road to prevent them from talking to the police about the abuse when the police came regarding furniture damaged during delivery. Investigator Moyar found a report that confirmed the date of the event the girls described.

The girls' statements regarding the incident at Chapa's apartment were further corroborated by the testimony of Investigator Israel Hernandez with the HCSO who testified that in late December 2013 he took a call from Olivarez about furniture that had been damaged during delivery at an apartment on Owassa Road. Hernandez went inside the apartment and Olivarez appeared to be the only one home. Olivarez stated she was living at the apartment.

Evonne Garcia, R.N., a SANE nurse, testified at trial that she performed examinations on both G.D.S. and C.D.S. When she examined G.D.S., G.D.S. reported the last time Chapa touched her vagina was on February 13, 2016, nine days earlier. As a result, Garcia did not attempt to obtain DNA evidence because the protocol is to look for DNA within a ninety-six hour window from the last event.

G.D.S. was ten years old at the time of her examination. G.D.S. reported that Chapa touched her using his fingers in her "private parts." G.D.S. further reported that Chapa "licked it" pointing to her female sexual organs and described vaginal penetration by Chapa's finger and tongue. She also stated, "My mom takes me to his apartment." G.D.S. further stated, "he touched my chest," sometimes with her clothes on, sometimes with them off. G.D.S. stated Chapa touched her "a lot of times." During her examination of G.D.S., Garcia noted that G.D.S. had: two bruises, one on her upper right thigh and one on her inner right thigh. Garcia further noted that G.D.S. had: a small tear to her labial commissure, and redness to the vestibular area, the labia minora, to her hymen down to the anal area, and the perineum. G.D.S. also had a urinary tract infection (UTI). According to Garcia, G.D.S.'s UTI could be a result of sexual assault or other causes and the UTI could have caused some of the redness in her genital area, but a UTI would be very unlikely to cause the redness to the hymen. Garcia testified that the tear to G.D.S.'s anterior labial commissure could have been caused by sexual assault or by G.D.S. scratching from irritation from the UTI.

Garcia testified that she also examined C.D.S., who was nine at the time. Garcia testified regarding the history she took from C.D.S. who told her that Chapa touched her

4

"sapo" and pointed to her female sexual organ; he put his finger in her "sapo" and in her butt more than four times starting when she was in the first grade, and he also touched her chest. C.D.S. reported that when Chapa touched her, her clothes were off, his clothes were off, and he touched her with his hands. According to Garcia, C.D.S. stated that Chapa made her touch him in his "sapo" too. C.D.S. was scared because he told her that if she said anything, he would kill her. Chapa most recently touched her on February 13, 2016. C.D.S. told Garcia that he touched her in front of her mother and also when her mother was not there. C.D.S. described a time when Chapa locked the girls up in a bedroom when the police came so they would not tell the police about the abuse. The only physical finding Garcia noted was immediate anal dilation when Garcia spread C.D.S.'s buttocks. That finding can occur in a child who is chronically constipated, but Garcia will usually see stool present and she did not. Garcia explained that immediate anal dilation can also result from regular anal penetration.

C.D.S. testified at trial that Chapa penetrated her vaginally with his fingers and in her anus. She described the penetration of her "sapo" and her butt. Her mother took her to Chapa's apartment and was sometimes there when Chapa touched her, but not always. C.D.S. believed her mother knew about the abuse because C.D.S. read text messages between Olivarez and Chapa and although she did not recall what they said, she testified that the substance was that her mother knew what Chapa was doing to the girls. C.D.S. did not tell her mother that Chapa was touching them. C.D.S. saw Chapa touching G.D.S. in his room at the apartment on Owassa Road. G.D.S. was on the bed crying.

5

G.D.S. testified that Chapa also penetrated her vaginally with his fingers and with his tongue. He also touched her chest repeatedly. She was in fourth grade the first time it happened, and Olivarez and C.D.S. were at the grocery store. Chapa continued to penetrate her vaginally with his fingers when she was in fifth grade. G.D.S. told Olivarez, but Chapa did not stop; they just did not go to his apartment as often. G.D.S. testified that her mother was not in the apartment when Chapa abused her and G.D.S. never saw Chapa abuse her sister.

Chapa testified that he did not touch either girl inappropriately and that he was never alone with either of them. He further testified that he rarely saw them because he often worked out of town.

Olivarez testified that she and her daughters were very close, and they lived with her parents before and after her divorce. She and her daughters visited Chapa when he lived in the apartment on Owassa Road and sometimes spent the night. According to Olivarez, Alma befriended her and she did not know that Alma had married her former husband Jose. Olivarez testified that she let Alma take her girls for weekends to socialize with Alma's children.

Olivarez further testified that G.D.S. told her at one time that Chapa molested her but G.D.S. did not explain further; she just "ducked her head." Olivarez believed Chapa must have reprimanded G.D.S. Although Olivarez did not believe G.D.S. meant anything sexual, she stopped seeing Chapa. Olivarez denied that she knew that Chapa touched the girls sexually, although when Alma and she talked after C.D.S.'s outcry, Olivarez told Alma that she had already taken care of it, referring to G.D.S.'s report of abuse. Olivarez

6

also denied that she ever left the girls alone at the apartment when Chapa was there, although she admitted she might have napped or showered while the four of them were at the apartment. Olivarez testified at trial that she was back in a relationship with Chapa and they drove to and from court together but they did not live together.

The jury convicted Chapa of continuous sexual abuse of G.D.S. and C.D.S and convicted Olivarez as a party to the offense. The jury assessed Olivarez's punishment at twenty-five years' imprisonment on each count in the Institutional Division of the Texas Department of Criminal Justice. The trial court imposed concurrent sentences.

Olivarez timely filed a motion for new trial alleging that the evidence at trial was insufficient and multiple other deficiencies, including ineffective assistance of counsel. The motion was overruled by operation of law. *See* TEX. R. APP. P. 21.8(c). Olivarez filed this appeal.

## II. SUFFICIENCY OF THE EVIDENCE

By her first issue, Olivarez argues that evidence of her mens rea is insufficient: "Based on Appellant's knowledge or lack thereof, her actions do not rise to level of intent or knowledge to promote, or assist the co-defendant in the commission of any offense. The State failed to meet its burden of proof as to the Appellant's mens rea."

### A. Standard of Review and Applicable Law

The Court applies the sufficiency standard from *Jackson v. Virginia*, which requires the reviewing court to "view[] the evidence in the light most favorable to the prosecution," to determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. 307, 319 (1979); *Tate v. State*, 500

S.W.3d 410, 413 (Tex. Crim. App. 2016) (applying *Jackson* standard). When a reviewing court views the evidence in the light most favorable to the verdict, it is required to defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Tate*, 500 S.W.3d at 413. "The reviewing court must give deference to the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19). If the record supports conflicting inferences, we presume that the fact finder resolved the conflict in favor of the prosecution and defer to that resolution. *Garcia v. State*, 367 S.W.3d 684, 686–87 (Tex. Crim. App. 2012).

Review of the "sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case." *Garcia*, 367 S.W.3d at 687 (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). A hypothetically correct jury charge is "one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik*, 953 S.W.2d at 240.

## B.    Discussion

Olivarez argues that the State did not establish beyond a reasonable doubt that she had the requisite intent and knowledge. The elements of continuous sexual abuse of a young child are:

8

> (1) during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims; and
>
> (2) at the time of the commission of each of the acts of sexual abuse, the actor is 17 years of age or older and the victim is a child younger than 14 years of age, regardless of whether the actor knows the age of the victim at the time of the offense.

TEX. PENAL CODE ANN. § 21.02(b). Olivarez was charged as a party pursuant to § 7.02(a)(2), (3).[2] *Id.* § 7.02. Thus, she must have had an intent to aid, promote, or assist in Chapa's offense.

C.D.S. testified that Olivarez knew that Chapa was abusing her and G.D.S. She believed her mother knew based upon the messages she read between her mother and Chapa. C.D.S. also told the forensic interviewer that Olivarez locked them in the bedroom in Chapa's apartment in December 2013 so they would not talk to the police about the abuse when the deputy came to take the report on the damaged furniture. That Olivarez prevented her daughters from talking to the police about Chapa's conduct towards them as early as December 2013, indicates Olivarez knew that he was sexually abusing her children for at least two and a half years before C.D.S.'s outcry in 2016. In

---

[2] Section 7.02 reads in pertinent part:

> (a) A person is criminally responsible for an offense committed by the conduct of another if: . . .
>
> > (2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense; or
> >
> > (3) having a legal duty to prevent commission of the offense and acting with intent to promote or assist its commission, he fails to make a reasonable effort to prevent commission of the offense.

TEX. PENAL CODE ANN. § 7.02.

addition, C.D.S. reported to the SANE nurse that Chapa sometimes touched C.D.S in front of Olivarez, that "sometimes when Chapa called her, she didn't want to go and when that happened, Olivarez got her by the arm and took her there—they both knew the reason, that Chapa was going to touch her and G.D.S."

G.D.S. testified that she told her mother that Chapa was touching her and Olivarez told G.D.S. she would talk to him. Afterwards, they continued to go see Chapa on weekends, but not as often. G.D.S. also testified that the first time Chapa sexually abused her, she was in the fourth grade and he continued this conduct until she was was in the fifth grade on the weekends she and her mother and sister spent with him.

C.D.S. and G.D.S. contradicted Olivarez's claim that she stopped seeing Chapa. Both girls separately told Lopez that Chapa abused them on February 13, 2016, two days before C.D.S. made her outcry.

During the recorded conversation on February 18, 2016, just three days after Jose told Olivarez of C.D.S.'s outcry, Olivarez admitted that she might be facing jail time. Olivarez's statement to Alma that she might be facing jail time, her denial that she took the little girls to Chapa the Friday before C.D.S.'s outcry, and her concealment of the girls from the police to prevent them from revealing the abuse in December 2013, reveal a consciousness of guilt which may be considered as part of the inquiry on sufficiency of evidence. *See Powell v.* State, 194 S.W.3d 503, 507 (Tex. Crim. App. 2006); *Hyde v. State*, 846 S.W.2d 503, 505 (Tex. App.—Corpus Christi–Edinburg 1993, pet. ref'd.) ("A 'consciousness of guilt' is perhaps one of the strongest kinds of evidence of guilt.").

It is the jury's province to evaluate the credibility of the witnesses and to resolve

10

conflicting and contradictory testimony.   *See Hooper*, 214 S.W.3d at 13.   We conclude that the jury's verdict is supported by sufficient evidence.   *See Kou v. State*, 536 S.W.3d 535, 540 (Tex. App.—San Antonio 2017, pet. ref'd); *Bleil v. State*, 496 S.W.3d 194, 203 (Tex. App. .—Fort Worth 2016, pet. ref'd) (affirming mother's conviction as a party to continuous sexual abuse of a child).

We overrule Olivarez's first issue.

### III.   JURY CHARGE

By her second issue, Olivarez argues that she was denied a fair trial because the jury charge on count two instructed the jury to "consider only those acts committed against GDS in finding [Olivarez] guilty in the sexual assault of CDS, an egregious error requiring reversal and a new trial."

### A.   Standard of Review

We review jury charge issues to first determine whether error exists.   *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005).   If we find error, we analyze the error for harm.   *Id.*   If the defendant failed to object, we will not reverse unless we find egregious harm.   *Id.* at 744.   "Jury-charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016) (internal citation omitted); *Warner v. State*, 245 S.W.3d 458, 461 (Tex. Crim. App. 2008).   Under the relevant standard, we have traditionally considered (1) the entirety of the jury charge, (2) the state of the evidence, (3) counsel's arguments, and (4) any other relevant information revealed by the entire trial record.   *Marshall*, 479 S.W.3d at 843.

11

**B.    Discussion**

In count two, the jury charge carefully defined terms, described the offenses, and then set out the application paragraphs for a finding of guilt based upon Chapa's conduct with C.D.S. for continuous sexual abuse, aggravated sexual assault, and indecency with a child.    After those paragraphs, paragraph 10 mistakenly references count one rather than count two, which is error.[3]    Olivarez did not object at trial; defense counsel affirmatively stated, "No objection" when asked about the charge.    The parties did not argue the error during closing.

The jury charge carefully laid out the acts that the State had to prove to establish continuous sexual abuse of C.D.S, acts that C.D.S. testified to and that she described to the SANE nurse.    After considering the entire jury charge, the evidence, and counsel's arguments, *see Marshall*, 479 S.W.3d at 843, we conclude there is no egregious harm. *Id.*

We overrule Olivarez's second issue.

## IV.    EVIDENTIARY RULINGS

By her third issue, Olivarez complains of the admission of evidence regarding the partial recorded statement between Olivarez and Alma, Olivarez's text messages with

---

[3] The instruction stated:

You are instructed that the Defendant may be convicted of only one of the offenses defined in these instructions for Count *One*, to wit: Continuous Sexual Abuse of Child, Aggravated Sexual Assault of a Child, of Indecency with a Child by Contact, and the Defendant can be convicted only as to that offense, if any, which is proved beyond a reasonable doubt.

(Emphasis added).

12

Chapa, and G.D.S. and C.D.S.'s medical records. Olivarez argued that each piece of evidence was prejudicial.

## A. Standard of Review and Applicable Law

An appellate court reviews a trial court's evidentiary ruling for an abuse of discretion. *See Apolinar v. State*, 155 S.W.3d 184, 186 (Tex. Crim. App. 2005); *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003); *Epps v. State*, 24 S.W.3d 872, 879 (Tex. App.—Corpus Christi–Edinburg 2000, pet. ref'd). A trial court abuses its discretion when it acts without reference to any guiding rules and principles and "when [its] decision lies outside the zone of reasonable disagreement." *McCarty v. State*, 257 S.W.3d 238, 239 (Tex. Crim. App. 2008); *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990).

## B. Discussion

### 1. Partial Recorded Statement

Although Olivarez's counsel complains of the admission of the partially recorded conversation in her brief as prejudicial, counsel does not discuss this evidence and why its admission was allegedly erroneous. Counsel for Olivarez objected at trial on the grounds of hearsay, the best evidence rule, and bolstering. *See* TEX. R. EVID. 802, 1002.

First, the trial court correctly overruled Olivarez's trial objections. Olivarez's own out-of-court statements constitute admissions and are not hearsay. *See id.* R. 801(e)(2)(A); *Ripstra v. State*, 514 S.W.3d 305, 315 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (holding "requirements for admissibility of an admission of a party opponent under Rule 801(e)(2) is that the admission is the opponent's own statement

13

and that it is offered against her."). The best evidence rule has no application here. *See id.* R. 1002.

Because Olivarez's trial objection does not comport with her argument on appeal, she has not preserved error. TEX. R. APP. P. 33.1(a)(1); *Ripstra*, 514 S.W.3d at 314; *Alcala v. State*, 476 S.W.3d 1, 25 (Tex. App.—Corpus Christi–Edinburg 2013, pet. ref'd) ("Therefore, because counsel's objection at trial does not comport with the issue raised on appeal, the error, if any, was waived.").

### 2. Text Messages

The text messages between Chapa and Olivarez at issue were referenced by C.D.S. during her testimony. C.D.S. testified she read the messages, but could not recall what they said, although she had the impression that her mother knew that Chapa was abusing her and her sister based upon the messages' content. Defense counsel for Olivarez objected on hearsay grounds to admission of the content of the text messages before C.D.S. testified that she did not recall. The trial court sustained his objection. When the State asked C.D.S. whether she felt her mother knew about the abuse, Olivarez's counsel objected, "Calls for speculation. All based on hearsay," which the trial court overruled.

On appeal, Olivarez argues that C.D.S.'s testimony that she believed her mother knew about the abuse and it made her feel sad and mad was improper character conformity evidence that should have been excluded under Rules 404(b), 403, and its admission denied Olivarez the right to confront the witness. *See* U.S. CONST. amend. VI; TEX. R. EVID. 403, 404(b). On appeal, Olivarez further argues that there was no

14

authentication of the purported text messages.

Olivarez's objections on appeal do not comport with her trial objections. As a result, she failed to preserve her objection to this evidence. *See* TEX. R. APP. P. 33.1(a)(1); *Ibarra v. State*, 11 S.W.3d 189, 197 (Tex. Crim. App. 1999) (failing to object on the same ground on appeal as at trial waives appellate review); *Alcala*, 476 S.W.3d at 25.

Olivarez waived this portion of issue three.

### 3. Medical Records

Olivarez argues that the children's medical records were improperly admitted and included prejudicial materials. Counsel further argues that C.D.S. "refuted" the nurse's notes. Olivarez's complaint relates to State's Exhibit 22, the nurse's notes from Mission Regional Medical Center medical records dated February 24, 2015, the date of the girls' sexual assault examinations. Nurse Garcia wrote a narrative history as given to her by each child. Olivarez's complaint appears to be that there are discrepancies between the reports in the medical records and the testimony of each child at trial.

Exhibit 22 was offered as a business record during the testimony of Garcia. Olivarez objected on the grounds of hearsay, best evidence, and bolstering. The trial court overruled counsel's objections. Counsel made no further objection to the narratives during Lopez's testimony regarding the narratives, arguably waiving the objection to the records themselves. *See Fuentes v. State*, 991 S.W.2d 267, 273 (Tex. Crim. App. 1999) ("In order to preserve error, the objecting party must continue to object

15

each time the objectionable evidence is offered."*); Narvaiz v. State*, 840 S.W.2d 415, 430 (Tex. Crim. App. 1992).

Furthermore, the history given by each child was admissible as a statement for the purpose of medical diagnosis and treatment. *See* TEX. R. EVID. 803(4); *Franklin v. State*, 459 S.W.3d 670, 677–78 (Tex. App.—Texarkana 2015, pet. ref'd) (holding trial court did not abuse its discretion in finding nurses notes from SANE exam fit within Rule 803(4) exception); *see also Ramos v. State,* No. 13-18-00043-CR, 2019 WL 2221675, at *4 (Tex. App.—Corpus Christi–Edinburg May 23, 2019, pet. ref'd) (mem. op., designated not for publication). The trial court did not abuse its discretion in admitting the nurse's notes that included the children's history. *See* TEX. R. EVID. 803(4).

Accordingly, Olivarez's third issue is overruled.

## V.    INEFFECTIVE ASSISTANCE OF COUNSEL

By her fourth issue, Olivarez argues that counsel provided ineffective assistance by failing to request a jury instruction on a mistake of fact defense. Olivarez argues that because there was evidence that Olivarez was not told that Chapa was sexually abusing her daughters, her counsel should have requested a mistake of fact instruction. But Olivarez's brief does not cite any cases related to the applicability of mistake of fact to continuous sexual abuse of a young child or any analogous case. The only cases cited relate to the standard of review for a claim of ineffective assistance of counsel. Accordingly, we find that this issue is inadequately briefed. *See* TEX. R. APP. P. 38.1(i).

We overrule Olivarez's fourth issue.

16

## V.    CONCLUSION

We affirm the judgment of the trial court.

GINA M. BENAVIDES,
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed the
3rd day of October, 2019.