# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00297-CR

---

**Tommy Lee Schlett, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 368TH DISTRICT COURT OF WILLIAMSON COUNTY
### NO. 16-2235-K368
### THE HONORABLE SARAH SOELDNER BRUCHMILLER, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

Tommy Lee Schlett pleaded guilty to one count of intoxication manslaughter with a vehicle and two counts of intoxication assault with a vehicle causing serious bodily injury, and the trial court sentenced him to twenty years' imprisonment for the first offense and to eight years' imprisonment for the other two offenses. *See* Tex. Penal Code §§ 12.33, .34, 49.07, .08. In six issues on appeal, Schlett challenges his convictions by arguing that the trial court erred by overruling his objections to the admission of photographs of the collision, of autopsy photographs, and of evidence concerning text messages sent in the hours leading up to the collision and by imposing a sentence that constituted cruel and unusual punishment and violated the statutory objectives found in section 1.02 of the Penal Code. We will affirm the trial court's judgments of conviction.

**BACKGROUND**

Around 5:00 a.m. on May 21, 2016, Tiffany Reed and Dian Glee drove to Venus Weatherton's home so that the three nursing aides could carpool to work. Shortly after Reed and Glee arrived, the trio left in Weatherton's car and drove to work on highway 195, which is a divided highway running between Georgetown, Texas, and Killeen, Texas. Reed sat in the front passenger seat, and Glee sat in the backseat. During the trip, Weatherton moved into the left lane because of traffic in the right lane. Suddenly, the car in front of her reduced its speed before driving off the highway entirely. As Weatherton wondered why the vehicle was moving off the highway, she noticed headlights from a car driving in the wrong direction on the highway heading toward her. Before Weatherton could take any evasive action other than applying her brakes, the other car slammed into hers, hitting her vehicle head on. Schlett drove the vehicle that collided with Weatherton's vehicle.

Following the collision, the driver of the vehicle who drove off the highway called 911 at approximately 5:40 a.m. and went to check on the occupants of the two vehicles. Before first responders arrived, Glee died from her injuries in the collision even though she had been wearing her seatbelt.

The first responders had to cut Weatherton's car open to get Reed and Weatherton out of the vehicle before they could be transported to the hospital. When Weatherton arrived at the hospital, she learned that her heel had been crushed, and she had to have several surgeries to attempt to repair the damage. As a result of the injuries, she used a walker for half a year, was unable to work for a year, and will never be able to walk normally again. Even though she started working again, she could only work part time because of her foot pain. Weatherton also

2

had to see a psychiatrist because of the nightmares that she experienced following the collision and was diagnosed with posttraumatic stress disorder.

After Reed arrived at the hospital, the treating medical staff learned that Reed had severe injuries requiring nine surgeries to repair damage to her hand, wrist, face, ankle, and abdomen, including removing two-thirds of her small intestine, her appendix, and a portion of her abdominal wall, and repairing an injury to her aorta. Reed was placed in a medically induced coma for five days, stayed in the hospital for another month after being revived, was sent to a rehabilitation hospital to relearn how to perform basic activities like walking and eating, and underwent physical and occupational therapy for more than a year. She was unable to work during her recovery and had to move in with her parents, and because of the trauma she suffered from the collision, she experienced nightmares and had to see a psychiatrist.

When the first responders went to check on Schlett, they observed that he was unconscious, was unresponsive to painful stimuli, and smelled like alcohol. Schlett was transported to a hospital where the treating medical personnel had to perform three surgeries resulting in the removal of parts of his small intestine, large intestine, colon, and bowel, resulting in the need for a colostomy bag. While at the hospital, samples of his blood were taken, and the police obtained a warrant to obtain those samples and subject them to testing. A few weeks later, Schlett was transferred to the San Antonio Military Medical Center because he was in the Army. The investigating officers seized items from Schlett's car, including his cell phone and a letter that he had written to Army officials.

After investigating the collision, the police obtained an arrest warrant for Schlett, and he was charged with one count of intoxication manslaughter with a vehicle and two counts of intoxication assault with a vehicle causing serious bodily injury. At the start of the trial,

3

Schlett pleaded guilty to all three counts and pleaded true to a deadly-weapon allegation. During the trial on punishment, the State called as witnesses the driver who veered off the road before the collision, Weatherton, Reed, Weatherton's husband, Glee's son, a paramedic, investigating officers, a forensic toxicologist, a forensic pathologist who performed the autopsy on Glee, the hospital physician who treated Schlett and Reed, and an investigator for the district attorney's office. Those witnesses testified regarding the events set out above.

During the testimony of one investigating officer, the trial court admitted into evidence thirty photos of the scene taken after Schlett, Weatherton, and Reed had all been transported to the hospital. The investigating officer testified that Schlett's vehicle was on the wrong side of the highway and that the two vehicles were travelling at approximately the same speed when the collision occurred. Further, the officer explained that the force of the impact resulted in the color of Glee's work clothes being transferred onto her seatbelt. In addition, the officer related that there was mud on Schlett's car, indicating that it had been driven off road recently, but the officer testified that the investigation did not reveal where Schlett entered the wrong side of the highway. The officer also testified that Schlett turned himself in after learning about his arrest warrant. Moreover, the officer recalled that Schlett seemed remorseful when talking with the officer at the hospital but did not remember anything about the collision or the events leading up to it. Similarly, the physician who treated Schlett at the hospital related that Schlett seemed remorseful and wanted to accept responsibility for what he did.

The forensic toxicologist testified that he performed blood-alcohol testing on a sample of Schlett's blood collected at the hospital at 6:59 a.m. on the day in question. The results of the testing showed that Schlett had a blood-alcohol level of .245, and this result was confirmed by a test independently run by the hospital. The toxicologist testified that to produce

4

that result, someone of Schlett's mass would need to have at least thirteen standard alcoholic drinks in his system at the time of the blood draw.

When the forensic pathologist testified about Glee's autopsy, he explained that Glee's injuries were consistent with a head-on collision and that Glee died from blunt trauma caused by the collision. More specifically, the pathologist explained that the deceleration caused by the collision resulted in tears to Glee's brain stem and in her first cervical vertebrae being pushed forward and restricting the opening for her brain stem. The pathologist described these injuries as causing "near instantaneous death" and as "rapidly fatal" injuries. Additionally, the pathologist testified that Glee had other injuries that were consistent with a passenger wearing a seatbelt during a collision. During the pathologist's testimony, the trial court admitted twelve photos taken during the autopsy.

Following the pathologist's testimony, one of the investigating officers testified regarding a cell phone extraction that was performed on Schlett's phone after it was discovered in his vehicle following his being taken to the hospital. During the officer's testimony, the trial court admitted a timeline created by the police listing text messages that Schlett received and sent in the hours leading up to the collision, indicating, among other things, Schlett's desire to consume alcohol and travel to various locations. After going through the text messages, the officer explained that Schlett did not respond to any more messages after responding to his girlfriend at 5:13 a.m.

During the officer's testimony, certified court documents concerning Schlett's prior convictions were admitted into evidence. The first packet pertained to an offense from another state from 2007 and showed that Schlett was arrested for driving while intoxicated with a blood alcohol concentration of .146, that the charges were reduced to consuming alcohol in

5

public, and that Schlett was convicted of the reduced offense. The second packet pertained to an offense from another state from 2011 and documented that Schlett admitted to committing the offense of negligent driving by operating "a motor vehicle in a negligent fashion causing a danger to persons and/or property while exhibiting the effects of having consumed alcohol." Additionally, the letter written by Schlett and found in his car was admitted into evidence. In the letter, Schlett requested that he be given an exception to a policy prohibiting him from being a recruiter due to his 2011 conviction for negligent driving. Schlett admitted that he "had a couple of drinks" that day, had a blood-alcohol concentration of .09, and was charged with driving while intoxicated, but he explained that he fought the charge and got it reduced to negligent driving and that ever since that conviction he "always ha[s] a plan" to ensure that he "never put[s] [him]self in any situation to have that happen again" and to instead "mak[e] responsible decisions."

After the State rested its case, Schlett called as witnesses correctional officers, military colleagues, a former soldier who is part of a nonprofit aimed at helping veterans with mental-health issues, the chaplain at the jail where Schlett had been residing, a neuropsychologist, and Schlett's father. The witnesses testified regarding Schlett's difficult childhood and traumas that he experienced while deployed oversees in the Army, soldiers having difficulty acclimating to civilian life following deployment, stigmas that can prevent people in the Army from seeking help for substance-abuse issues, and Schlett's remorse and good behavior following the collision.

Schlett elected to testify and explained that his deployments were anxiety inducing because he had to be on the lookout for bombs and would be fired upon. In fact, he explained that the stress had resulted in one of his colleagues trying to kill himself and that he

6

found his colleague and had to treat his significant injuries. Regarding another incident, he described observing a car collision while deployed resulting in significant injuries. When describing returning home, he said that he had a difficult time returning to civilian life because he did not have a sense of purpose, that he increased his alcohol use, that he was depressed and burnt out, and that he had difficulty sleeping and had nightmares. Additionally, Schlett revealed that he sought help from the Army Substance Abuse Program, that the Program referred him to another program for additional help, and that he had been to a few sessions before the incident.

Schlett acknowledged that he went out on May 20, 2016, planning to drink, that the events that unfolded were avoidable, and that he was responsible for what happened to Glee, Reed, and Weatherton; however, he also relayed that he was very sorry for what he had done, that he wished he had died instead of Glee, that he contacted Glee's family as soon as he was medically able, that he turned himself in when he learned about his arrest warrant, and that he has made significant and positive changes in his life following the incident. In his testimony, Schlett acknowledged that he had previously been convicted of public intoxication and negligent driving for driving while under the influence of alcohol. Although Schlett acknowledged that those cases should have been warnings signs, he testified that he continued to use alcohol and that a few months after being convicted of negligent driving, he was convicted of driving while intoxicated after having a blood-alcohol level of .22.

After hearing the evidence summarized above, the trial court sentenced Schlett to twenty years' imprisonment for the intoxication-manslaughter count and to eight years' imprisonment for the intoxication-assault counts. Schlett did not timely file a notice of appeal but was granted permission to file an out-of-time appeal. *See Ex parte Schlett*, No. WR-94,746-01, 2023 WL 3215563, at *1 (Tex. Crim. App. May 3, 2023) (op., not designated for publication)

7

(per curiam). After obtaining permission to appeal, Schlett filed a motion for new trial and a notice of appeal.

## DISCUSSION

In his first issue on appeal, Schlett alleges that the trial court erred by overruling his objections and admitting photos showing the scene of the collision. In his second and third issues on appeal, Schlett argues that the trial court erred by overruling his objections and admitting into evidence autopsy photos. In his fourth issue, Schlett contends that the trial court erred by overruling his objections and admitting into evidence text messages retrieved from his cellphone. In his fifth and sixth issues, Schlett argues that his punishments constitute cruel and unusual punishment and violate the statutory objectives for assessing punishments.

### Photos of the Accident Scene

In his first set of arguments challenging the trial court's decision to admit thirty photos of the scene of the collision, Schlett contends that not all of the photos should have been admitted because the photos were cumulative of one another. At trial, Schlett made the following objection to the State's offering the photos for admission into evidence: "I think you can accomplish the task the State is trying to do with five pictures, six pictures. It's just very cumulative because some of the pictures are the same."

Although Schlett objected on the basis that the photos were cumulative, he did not specify which photos were cumulative and instead only asserted that "some" of the offered exhibits were cumulative. Generally, before a party may present "a complaint for appellate review, the record must show that . . . the complaint was made to the trial court by a timely request, objection, or motion" "with sufficient specificity to make the trial court aware of the

8

complaint." *See* Tex. R. App. P. 33.1(a). Preservation of error is a "systemic requirement" on appeal. *See Darcy v. State*, 488 S.W.3d 325, 327 (Tex. Crim. App. 2016). An issue raised on appeal generally must be preserved by a specific objection at trial. *Resendez v. State*, 306 S.W.3d 308, 312 (Tex. Crim. App. 2009). Accordingly, to preserve a complaint on appeal, the party must make a specific objection letting the trial court "know what he wants, why he thinks himself entitled to it, and do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it." *Id.* at 312-13 (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)); *see Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009). A general objection to evidence that consists of both admissible and inadmissible material does not preserve error. *Schmidt v. State*, 612 S.W.3d 359, 368 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd). Appellate courts should not address the merits of an issue that has not been preserved for appellate consideration. *See Blackshear v. State*, 385 S.W.3d 589, 591 (Tex. Crim. App. 2012).

Because Schlett did not specify at trial which photos were the "some" that he considered cumulative and because he agreed that some of the photos were admissible, the issue was not preserved for our review. *See* Tex. R. App. P. 33.1; *see also Conley v. State*, No. 01-21-00566-CR, 2022 WL 17981980, at \*13 (Tex. App.—Houston [1st Dist.] Dec. 29, 2022, pet. ref'd) (mem. op., not designated for publication) (concluding that objection to "some of the offered exhibits" as being cumulative did not preserve issue for review).

In his next set of arguments in his first issue, Schlett contends that the trial court erred by admitting the thirty photographs because they were irrelevant and because the admission was unfairly prejudicial in violation of Rule of Evidence 403. To be preserved for appeal, the complaint made on appeal must comport with the complaint made in the trial court.

9

*See Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012); *Pena*, 285 S.W.3d at 464. "A complaint will not be preserved if the legal basis of the complaint raised on appeal varies from the complaint made at trial." *Lovill v. State*, 319 S.W.3d 687, 691-92 (Tex. Crim. App. 2009).

As set out above, Schlett did not object to the admission of the photos on relevancy or unfair prejudice grounds. Accordingly, Schlett's appellate arguments based on those grounds do not comport with his cumulative objection made at trial, and those complaints were not preserved for appellate consideration. *See* Tex. R. App. P. 33.1. Although Schlett notes on appeal that "needlessly presenting cumulative evidence" is one of the factors that may be considered when evaluating whether evidence should be excluded under Rule 403, *see* Tex. R. Evid. 403, and argues that his cumulative objection should therefore be considered sufficient to preserve a Rule 403 claim, we note that courts treat simple cumulative objections as distinct from a Rule 403 objection and have concluded that cumulative objections, without more, do not preserve claims under Rule 403 that the admission of evidence was unfairly prejudicial, *see Williams v. State*, 294 S.W.3d 674, 685 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (concluding that appellant's unfairly prejudicial complaint on appeal was not preserved when he only objected to evidence as cumulative and not relevant at trial); *see also Ortiz v. State*, No. 04-18-00430-CR, 2022 WL 1230099, at *2 (Tex. App.—San Antonio Apr. 27, 2022, no pet.) (mem. op., not designated for publication) (determining that objection that photos were cumulative did not preserve "unfairly prejudicial complaint on appeal").

For these reasons, we overrule Schlett's first issue on appeal.

**Autopsy Photos**

In his second and third issues on appeal, Schlett contends that the trial court erred by denying his objections to the admission of the autopsy photos. The color photos at issue are the following as shown in the record and as described by the testimony at trial:

Photo 1: A picture of Glee's dead body in her uniform at the morgue before the autopsy had started.

Photo 2: A picture of her naked body, including her genitalia and breasts, before the autopsy began that depicts a dark red abrasion from her left chest to the right side of her body.

Photo 3: A picture of the left side of her neck and chest depicting an abrasion consistent with a seatbelt injury for a restrained passenger.

Photo 4: A picture of her left abdomen showing an abrasion extending to her lower left back.

Photo 5: A picture of her chest and upper abdomen depicting blood in the soft tissue of the neck and chest associated with rib fractures on the right side.

Photo 6: A picture of lacerations to her liver.

Photo 7: A picture of the backside of her liver showing more lacerations.

Photo 8: A picture of her kidneys showing hemorrhage in the area.

Photo 9: A picture showing hemorrhage to her brain stem after her brain had been pulled backward during the autopsy to show the brain stem.

Photo 10: A picture of the base of her skull after her brain had been removed.

Photo 11: A picture of her skull showing that the first vertebrae had been pushed forward reducing the opening for the brain stem.

Photo 12: A picture of her brain stem.

In his second issue, Schlett argues that the photos should not have been admitted because they were not relevant. When asserting that the photos were not relevant, Schlett emphasizes that he pleaded guilty and agreed to stipulate to the cause of Glee's death. Further,

11

Schlett argues that the photos of nonfatal injuries to Glee were not relevant because the fatal injuries resulted in her dying almost instantly. In addition to challenging the relevancy of the photos, Schlett contends in his third issue that they should not have been admitted because the images were unfairly prejudicial. More specifically, Schlett contends that the photos had no probative value because the cause of Glee's death had already been established; because the photos added nothing to the testimony of the pathologist who performed the autopsy; because some of the photos did not show visible injuries; because the State had no need for the photographs after Schlett stipulated to Glee's cause of death; because the photos were gruesome, particularly where alterations to the body caused by the autopsy were depicted; because the images distracted from the issues of culpability and mitigation; because the photos were likely given undue weight by the trial court due to its inability to evaluate their medical significance; and because the presentation consumed an inordinate amount of time and repeated evidence that had already been conceded.

Appellate courts review a trial court's ruling regarding the admission or exclusion of evidence for an abuse of discretion. *See Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). Under that standard, a trial court's ruling will only be deemed an abuse of discretion if it is so clearly wrong as to lie outside "the zone of reasonable disagreement," *Lopez v. State*, 86 S.W.3d 228, 230 (Tex. Crim. App. 2002), or is "arbitrary or unreasonable," *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005). Moreover, the ruling will be upheld provided that the trial court's decision "is reasonably supported by the record and is correct under any theory of law applicable to the case." *Carrasco v. State*, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005). In addition, an appellate court reviews the trial court's ruling considering the

12

record before the court "at the time the ruling was made." *Khoshayand v. State*, 179 S.W.3d 779, 784 (Tex. App.—Dallas 2005, no pet.).

The purpose of a punishment proceeding is not to prove guilt but to allow the factfinder to assess punishment in a manner consistent with the objectives of the Penal Code. *Beham v. State*, 476 S.W.3d 724, 736 (Tex. App.—Texarkana 2015, no pet.). Those objectives include ensuring the public safety through the deterrent influence of the penalties imposed, rehabilitating those convicted of crimes, assessing punishment as may be necessary to prevent the occurrence of the criminal behavior, and determining a sentence that is proportionate to the seriousness of an offense. *See* Tex. Penal Code § 1.02. Accordingly, the test for relevancy is much broader at punishment to allow the factfinder to consider more evidence when deciding what punishment to impose out of the available range. *Beham*, 476 S.W.3d at 736. At the punishment stage, "evidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is being tried," and "any other evidence of an extraneous crime or bad act." Tex. Code Crim. Proc. art. 37.07. As the Court of Criminal Appeals has explained, "[w]hat is 'relevant' to the punishment determination is simply that which will assist the fact finder in deciding the appropriate sentence in a particular case." *Sims v. State*, 273 S.W.3d 291, 295 (Tex. Crim. App. 2008).

Although Schlett contends that the photos were not relevant because he pleaded guilty and stipulated to Glee's cause of death, the photos were relevant to establishing the extent and nature of Glee's injuries as well as her suffering, which are relevant considerations for assessing punishment. *See Brown v. State*, No. 02-16-00484-CR, 2018 WL 1755248, at *3 (Tex.

13

App.—Fort Worth April 12, 2018, pet. ref'd) (mem. op., not designated for publication). In addition, "[t]he State's right to introduce evidence is not restricted by the entry of a plea of guilty by the defendant, or by his admission of facts sought to be provided; relevant facts admissible under a plea of not guilty are also admissible under a plea of guilty." *Wyatt v. State*, 836 S.W.2d 334, 336 (Tex. App.—Houston [14th Dist.] 1992, pet. ref'd). "Evidence of the circumstances of the offense to which the defendant has plead guilty is clearly admissible at the sentencing hearing." *Id.* Moreover, the fact that Glee may have died quickly from her injuries does not mean that visual representations of the fatal and nonfatal injuries are not relevant to help establish the degree to which she did suffer before she died, and "a visual image of the injuries appellant inflicted on the victim is evidence that is relevant." *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007). Even when there is testimony regarding the injuries inflicted, that "does not reduce the relevance of the visual depiction." *Id.*; *see also Chamberlain v. State*, 998 S.W.2d 230, 237 (Tex. Crim. App. 1999) (explaining that visual evidence can provide "a point of comparison against which to test the credibility of a witness and validity of his conclusions").

Considering the preceding, we conclude that the trial court did not abuse its discretion by overruling Schlett's relevancy objection and admitting the photos. *See York v. State*, 566 S.W.2d 936, 938 (Tex. Crim. App. 1978) (explaining that introduction of evidence following guilty plea "is to enable the [factfinder] to intelligently exercise the discretion which the law vests in them to assess the penalty"). Accordingly, we overrule his second issue on appeal.

Regarding Schlett's third issue, evidence deemed relevant during the punishment phase may still be excluded if it violates Rule of Evidence 403. *See* Tex. R. Evid. 403; *Webster*

14

*v. State*, No. 02-03-00051-CR, 2004 WL 1067770, at \*1 (Tex. App.—Fort Worth May 13, 2004, no pet.) (mem. op., not designated for publication). Rule 403 specifies that relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. "Under Rule 403, it is presumed that the probative value of relevant evidence exceeds any danger of unfair prejudice. The rule envisions exclusion of evidence only when there is a clear disparity between the degree of prejudice of the offered evidence and its probative value." *Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009) (footnotes and internal quotation marks omitted). Accordingly, "the plain language of Rule 403 does not allow a trial court to exclude otherwise relevant evidence when that evidence is merely prejudicial. Indeed, all evidence against a defendant is, by its very nature, designed to be prejudicial." *Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013) (internal citation omitted).

Although this is not an exhaustive list, courts generally balance the following factors when performing a Rule 403 analysis: "(1) how probative the evidence is; (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence." *Colone v. State*, 573 S.W.3d 249, 266 (Tex. Crim. App. 2019); *see Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006). In this context, "probative value" refers to how strongly evidence makes the existence of a "fact of consequence" "more or less probable" and to how much the proponent needs the evidence, and "unfair prejudice" refers to how likely it is that the evidence might result in a decision made on an "improper basis," including "an emotional one." *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010) (quoting *Casey v.*

15

*State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007)). For photographs, courts may consider additional factors to determine whether the probative value is outweighed by the danger of unfair prejudice, including "the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or in black and white, whether they are close-up and whether the body depicted is clothed or naked." *Hayes v. State*, 85 S.W.3d 809, 815 (Tex. Crim. App. 2002).

A photograph is not rendered inadmissible merely because it is gruesome or might tend to arouse the passions of the factfinder unless it is offered solely for the purpose of inflaming the mind of the factfinder. *Ward v. State*, 787 S.W.2d 116, 120 (Tex. App.—Corpus Christi-Edinburg 1990, pet. ref'd). A photograph is admissible where it serves to support testimony regarding the injuries sustained by the victim. *McKinney v. State*, No. 05-05-01584-CR, 2007 WL 49668, at *17 (Tex. App.—Dallas Jan. 9, 2007, pet. ref'd) (op., not designated for publication). Autopsy photographs are generally admissible unless they depict mutilation of the victim caused by the autopsy itself. *Hayes*, 85 S.W.3d at 816. Further, the prejudicial value of victim photographs prior to an autopsy can be reduced where the body has been cleansed of excess blood and foreign material and appears on a clean metal gurney. *See Morales v. State*, 897 S.W.2d 424, 428 (Tex. App.—Corpus Christi-Edinburg 1995, pet. ref'd).

As set out above, the photos were probative because they showed the injuries that Glee sustained and helped establish the degree to which she suffered, and this element weighs in favor of admission of the photos. *See Gallo*, 239 S.W.3d at 763 (concluding that "gruesome" photographs of child victim's injuries were "highly probative" to show full extent of her injuries).

Similarly, the State's need for the evidence also weighs in favor of admission because Glee died from the collision and, therefore, could not testify regarding the injuries that

16

she sustained or the pain that she felt. *Cf. Hendrick v. State*, 473 S.W.3d 824, 831 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (explaining that "the State's need for the evidence was significant given that no one except appellant was present when the complainant died").

Moreover, the testimony regarding the photographs originated from one witness and constituted approximately ten pages out of a multi-volume reporter's record that is approximately six hundred pages in length, and therefore, the factor considering the time needed to develop the evidence also weighs in favor of admission. *See Brickley v. State*, 623 S.W.3d 68, 82 (Tex. App.—Austin 2021, pet. ref'd) (determining that time factor weighed in favor of admission where guilt-innocence phase was held over three days, where record was hundreds of pages long, and where testimony regarding extraneous offense was fewer than five pages); *Robisheaux v. State*, 483 S.W.3d 205, 221 (Tex. App.—Austin 2016, pet. ref'd) (finding time factor weighed in favor of admission where evidence regarding extraneous offense came in though one witness, where guilt-innocence phase lasted three days, and where testimony about extraneous offense "was only eight pages long").

Turning to the potential for the photos to impress the factfinder in an irrational and indelible way, we note that the photos are all in color. "However, the mere fact that a photograph is printed in color does not appear to be sufficient to make it unnecessarily gruesome or cause its probative value to be substantially outweighed by its inflammatory nature." *Grindele v. State*, No. 05-03-00440-CR, 2004 WL 628517, at *4 (Tex. App.—Dallas Mar. 31, 2004, no pet.) (op., not designated for publication). Similarly, although Glee is displayed without clothing in one of the photos, that fact is not sufficiently inflammatory to outweigh the photograph's probative value where it was offered to show injuries sustained in the collision. *See Rojas v. State*, 986 S.W.2d 241, 249, 250 (Tex. Crim. App. 1998) (determining that photo of

17

victim without clothing was not too prejudicial to be admitted where photo showed injuries to pelvic area).

Moreover, the photographs appear to be regular sized photos, and the State explained before the trial court ruled that it would not display the photos on a big screen. Further, the State related that it was not introducing all the photos that were taken during the autopsy and instead limited its exhibits to the photos showing injuries to Glee's body and organs sustained from the collision, and the State explained that the photos would assist the forensic pathologist's testimony regarding the injuries. *See Fields v. State*, No. 01-07-00856-CR, 2009 WL 723992, at *5 (Tex. App.—Houston [1st Dist.] Mar. 19, 2019, pet. ref'd) (mem. op., not designated for publication) (noting that photos corroborated testimony from trial). The photos show either different portions of Glee's body or different injuries.

Glee's body had been cleaned of any blood and debris, and she appeared on a clean surface. *See Morales*, 897 S.W.2d at 428. Further, although a few of the photos are moderate closeups of Glee's body, those photos do not depict her genitals. The photos of Glee's liver and kidneys do not show her body and instead show the organs after having been removed from her body. Although the photos of her brainstem and brain depict damage caused by the autopsy, the photos do not show the remainder of Glee's body and were offered to show the nature of Glee's injuries. Accordingly, despite the undoubtedly gruesome nature of some of the photos, this factor weighs at most slightly in favor of exclusion given the efforts undertaken to help mitigate the potential prejudice.

Given our resolution of the factors above, we conclude that the trial court did not abuse its discretion by admitting the autopsy photos. *See Cox v. State*, 495 S.W.3d 898, 903-09 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) (determining that trial court did not abuse its

18

discretion by admitting evidence where potential to impress in irrational way weighed in favor of exclusion but where other factors weighed in favor of admission). For these reasons, we overrule Schlett's third issue on appeal.

**Text Messages**

In his fourth issue on appeal, Schlett contends that the trial court erred by overruling his objections to the admission of evidence of some of the text messages sent by and received by his phone in the hours leading up to the collision. The text exchanges were purportedly between Schlett and his girlfriend, between Schlett and a bartender from a bar called La Boom, and texts between Schlett and several of his friends. The text messages were included in an exhibit that also contained maps showing three bars—La Boom, All Bottoms Up, and Shadow Lounge—and a home that were mentioned during the text exchanges before the collision. In addition, the exhibit contained a photo sent by Schlett's phone of Schlett with a friend who were both seemingly holding alcoholic drinks. After the trial court overruled Schlett's objections, an officer testified regarding the text messages, and the following text history was admitted into evidence:

[Bartender to Schlett at 5:43 p.m. on May 20, 2016]: Come on out I will take care of you

[Schlett to bartender at 5:43 p.m.]: I'll think about it ;)

[Bartender to Schlett at 5:44 p.m.]: Ok just let me know so I can tell them you are my guest so you can get in free also

[Schlett to bartender at 5:44 p.m.]: Sweet =)

[Schlett's girlfriend to Schlett at 8:45 p.m.]: I wish you were here to cuddle up with me. Can't wait until I have you here all to myself Are you going to bed early?

[Schlett to his girlfriend at 8:46 p.m.]: I can't wait either baby And no, some friends invited me out and offered to buy me drinks so I'm probably gonna do that

[Schlett's girlfriend to Schlett at 8:50 p.m.]: Just be careful babe. Make sure you don't drink too much then drive. I know you know this, but I'm just throwing that out there because I care. Have a good time and be safe

[Schlett to his girlfriend at 8:51 p.m.]: I know babe and I appreciate it

[Schlett to the bartender at 9:00 p.m.]: What time should I go?

[Bartender to Schlett at 9:04 p.m.]: Whenever its dead right now

[Schlett to bartender at 9:05 p.m.]: I'll swing by in about 45 mins

[Schlett's friend to Schlett at 10:40 p.m.]: Tell our homies to buy y drinks or u staying in

[Schlett to friend at 10:45 p.m.]: I'm at La Boom with Kat and [Bartender]

[Schlett's girlfriend to Schlett at 11:11 p.m.]: Are you having a good time?

[Schlett to his girlfriend at 11:13 p.m.]: So far so good babe

[Schlett to group of friends at 11:29 p.m.]: lol I got invited out by [Bartender], she's bartending and hooking me up with drinks. It's kinda dead right now

[Schlett to same group of friends at 11:30 p.m.]: I didn't think you'd wanna come out, plus I'm not staying here long. I'm just here for the free drinks lol

[Schlett's friend to Schlett at 11:31 p.m.]: Just got off u

[Schlett to his friend at 11:32 p.m.]: Still at La Boom, bout to leave

[Friend to Schlett at 11:32 p.m.]: prob gone hit up shadow or [All Bottoms Up]

[Schlett to friend at 11:32 p.m.]: Aight lemme know

[Schlett to group thread at 11:35 p.m. and sends photo of him and his friend]: Shot o'clock w/ this beauty

[Schlett's girlfriend to Schlett at 11:55 p.m.]: Are you winning?

[Schlett to girlfriend at 11:59 p.m.]: I won, we're done now. Just took some more shots

[Schlett's girlfriend to Schlett at 12:01 a.m. on May 21, 2016]: Yay babe! . . . . . How many shots did you take?

[Schlett to his girlfriend at 12:02 a.m.]: I'm not sure.  I think that's #3?  Lol

[Schlett's friend to Schlett at 12:03 a.m.]: [All Bottoms Up]

[Schlett to friend at 12:05 a.m.]: Cool be there shortly

[Schlett's girlfriend to Schlett at 12:05 a.m.]: Can you call me when you get in babe

[Schlett to his girlfriend at 12:06 a.m.]: Are you gonna be awake at 3 something in the morning?

[Schlett's girlfriend to Schlett at 12:07 a.m.]: Yup, I just wanna make sure you're good and to hear your sweet voice.

[Schlett to his girlfriend at 12:08 a.m.]: I think you just wanna hear my drunk voice lol

[Schlett to a friend at 12:56 p.m.]: I'm at [All Bottoms Up], bout to go to Shadow

[Schlett's friend to Schlett at 1:07 a.m.]: you staying til close?

[Schlett to friend at 1:08 a.m.]: Nah, I'm heading somewhere else in a bit

[Schlett to his friend at 1:09 a.m.]: I'm going to another bar

[Schlett to friend at 1:11 a.m.]: Go to Shadow Lounge

[Schlett to bartender at 2:06 a.m.]: Beer pong at my buddy's house if you're down

[Bartender to Schlett at 2:52 a.m.]: Where at

[Schlett to bartender at 2:55 a.m.]: [Provides address]

[Schlett to bartender at 3:30 a.m.]: You comin?

[Schlett to girlfriend at 3:33 a.m.]: Sorry babe, I'm kinda drunk lol, but yeah that's the song

[Schlett's girlfriend to Schlett at 5:09 a.m.]: Did you make it home ok

[Bartender to Schlett at 5:09 a.m.]: Awe well let me know if you get into an after party tomorrow night.  I am not taking anyone home tomorrow

[Schlett to his girlfriend at 5:10 a.m.]: It's all good, sweetheart.  I'm going home now

[Schlett to his girlfriend at 5:13 a.m.]: Lol yeah, I went to jack in the box

21

[Schlett's girlfriend to Schlett at 5:14 a.m.]: But you're home now?

On appeal, Schlett contends that the evidence concerning the text messages was admitted as proof of the identity of the individuals who sent and received the messages, as proof that Schlett and others took actions or made requests for actions based on the exchanged texts, and as proof that individuals went to the locations listed in the messages. Further, he highlights that the alleged authors of the messages sent to Schlett's phone did not testify at trial. Accordingly, Schlett urges that the evidence was improper hearsay. Alternatively, Schlett suggests that if the text messages were not offered for the truth of the matters asserted in the exchanges, then the text messages were irrelevant.

As discussed above, we review a trial court's admission of evidence for an abuse of discretion, *see Tillman*, 354 S.W.3d at 435, and will uphold the trial court's ruling if it is correct under any theory of law applicable to the case, *Carasco*, 154 S.W.3d at 129. Under the Rules of Evidence, hearsay is defined as a statement that "the declarant does not make while testifying at the current trial or hearing" and that "a party offers in evidence to prove the truth of the matter asserted." Tex. R. Evid. 801(d). Hearsay is generally inadmissible. *See id.* R. 802. However, statements "offered against an opposing party and" "made by the party in an individual or representative capacity" are not hearsay. *Id.* R. 801(e)(2). "The only requirements for admissibility of an admission of a party opponent under Rule 801(e)(2) is that the admission is the opponent's own statement and that it is offered against" the party. *Ripstra v. State*, 514 S.W.3d 305, 315 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd). Additionally, "[a]n out-of-court statement which is not offered to prove the truth of the matter asserted therein, but is offered for some other reason, is not hearsay." *Jones v. State*, 466 S.W.3d 252, 263 (Tex.

22

App.—Houston [1st Dist.] 2015, pet. ref'd) (quoting *Stafford v. State*, 248 S.W.3d 400, 407 (Tex. App.—Beaumont 2008, pet. ref'd)).  "A statement is not hearsay if its relevancy does not hinge on its truthfulness." *Id.*

Prior to the evidence being admitted, one of the testifying officers explained that he collected a cellphone from Schlett's car and that Schlett later admitted that the phone was his. Further, a forensic scientist explained that she performed an extraction of the data on Schlett's cellphone.  Moreover, the messages sent from Schlett's cellphone contained his admissions to consuming alcohol, to becoming intoxicated, and to driving or intending to drive after having consumed alcohol and, therefore, constituted admissions by a party opponent.  *See Ripstra*, 514 S.W.3d at 315 (concluding that Facebook posts constituted admissions by party opponent); *Jackson v. State*, Nos. 05-14-00274—00275-CR, 2015 WL 3797806, at *4 n.4 (Tex. App.— Dallas June 17, 2015, no pet.) (mem. op., not designated for publication) (concluding that defendant's text messages were not hearsay and were instead admissions by party opponent). Given the nature of the admissions, those text messages were also relevant to the issue of Schlett's punishment.  *See* Tex. Code Crim. Proc. art. 37.07; *see also Stewart v. State*, 129 S.W.3d 93, 96 (Tex. Crim. App. 2004) (explaining that "[e]vidence need not by itself prove or disprove a particular fact to be relevant; it is sufficient if the evidence provides a small nudge toward proving or disproving some fact of consequence").

Although some of Schlett's statements can be understood as admissions on their own, many of the statements cannot be fully understood without the context of the surrounding text messages.  For example, Schlett's message to the phone belonging to his girlfriend stating, "I'm not sure.  I think that's #3?  Lol," on its own would not seem to provide much information, but when the message is considered in the context that he was responding to a question about

23

how many shots of alcohol he had consumed, the importance of his statements becomes clear. Similarly, Schlett's message to his girlfriend's phone stating, "I know babe and I appreciate it," has additional meaning when read in the context of his responding to a message warning him not to drink and drive. Accordingly, the messages from the other phones are relevant to the punishment issues. *See* Tex. Code Crim. Proc. art. 37.07; *Stewart*, 129 S.W.3d at 96.

The State offered those text messages to show their effect on the recipient, to provide needed context to Schlett's text messages, and to make sense of those messages, not to establish the truth of the identity of the individuals who sent the messages or the truth of the activity the senders discussed. *Cf. Ruvalcaba v. State*, No. 01-22-00310-CR, 2023 WL 7497515, at *3 (Tex. App.—Houston [1st Dist.] Nov. 14, 2023, no pet. h.) (mem. op., not designated for publication) (determining that trial court did not abuse its discretion by admitting text messages where State argued that messages "were not offered for the truth of the matter, but to show context for . . . responses"); *McNeil v. State*, 452 S.W.3d 408, 419 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (noting that statements offered only to show effect on listener are not hearsay and concluding that interviewers' statements to defendant were not hearsay because they were not offered for truth of matter asserted). In other words, the text messages from the other phones were "offered for the purpose of showing what was said, rather than for providing the truth of the matter stated therein" or the identity of the senders, *see Johnson v. State*, 425 S.W.3d 344, 346 (Tex. App.—Houston [1st Dist.] 2011, pet ref'd), and "the relevance of the text message conversations was not in any way dependent upon the truth of the messages themselves," *see Ellis v. State*, 517 S.W.3d 922, 930 (Tex. App.—Fort Worth 2017, no pet.). Consequently, the messages do "not constitute hearsay." *Johnson*, 425 S.W.3d at 346; *see also Atkinson v. State*, No. 03-19-00204-CR, 2021 WL 936702, at *6 (Tex. App.—Mar. 12, 2021,

24

pet. ref'd) (mem. op., not designated for publication) (determining that text messages were not hearsay because they "were not offered for the truth of the matter asserted; that is, they were not intended to prove that a particular individual in fact wanted the particular drug requested").

For these reasons, we conclude that the trial court did not abuse its discretion by overruling Schlett's objections and admitting into evidence the text messages sent by and received by Schlett's cellphone in the hours leading up to the collision. Accordingly, we overrule Schlett's fourth issue on appeal.

**Punishment Assessed**

In his fifth issue on appeal, Schlett contends that the trial court erred by imposing a sentence that constituted cruel and unusual punishment. Similarly, Schlett argues in his sixth issue that the trial court erred by imposing a sentence that he believes was inconsistent with the statutory objectives of the Penal Code. *See* Tex. Penal Code § 1.02. When presenting these claims, Schlett contends that the sentences were grossly disproportionate to the crime committed and did not consider the mitigation evidence presented.

Schlett did not object on these grounds when the trial court assessed his punishment; instead, Schlett made these claims for the first time in his motion for new trial filed after he was granted an out-of-time appeal. *See Mestas v. State*, 214 S.W.3d 1, 4 (Tex. Crim. App. 2007) (explaining that effect of granting out-of-time appeal is restoring "the defendant to the position he occupied immediately after the trial court signed the judgment of conviction," meaning that defendant is placed in position where he can file notice of appeal and motion for new trial). The error-preservation requirement applies even to errors that are of constitutional dimension, such as claims that a sentence is cruel and unusual. *Solis v. State*, 945 S.W.2d 300,

25

301 (Tex. App.—Houston [1st Dist.] 1997, pet. ref'd). Similarly, claims asserting that an assessed punishment does not comply with the objectives of the Penal Code under section 1.02 must be preserved to make the claim on appeal. *See Nieto v. State*, No. 11-20-00163-CR, 2022 WL 2252424, at *2 (Tex. App.—Eastland June 23, 2022, pet. ref'd) (mem. op., not designated for publication); *Kessler v. State*, Nos. 05-20-00221-CR, -00225—00232-CR, -00234-CR, 2021 WL 5002423, at *2 (Tex. App.—Dallas Oct. 28, 2021, no pet.) (mem. op., not designated for publication).

To preserve the types of claims asserted in these issues, a defendant must object when his sentence is imposed or, in some circumstances, file a motion for new trial. *See Noland v. State*, 264 S.W.3d 144, 151 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd). If a defendant makes claims in a motion for new trial, he "must present the motion for new trial to the trial court within 10 days of filing it, unless the trial court in its discretion permits it to be presented and heard within 75 days from the date when the court imposes or suspends sentence in open court." Tex. R. App. P. 21.6. "If the defendant fails to timely present the motion, the issues raised in the motion are not preserved for appellate review." *Harris v. State*, 668 S.W.3d 83, 91 (Tex. App.—Houston [1st Dist.] 2022, pet. ref'd); *see Solano v. State*, 371 S.W.3d 593, 596 (Tex. App.—Amarillo 2012, no pet.).

To present the motion, "[t]he defendant must put the trial judge on actual notice that he desires the judge to take some action, such as making a ruling or holding a hearing, on his motion for new trial." *Gardner v. State*, 306 S.W.3d 274, 305 (Tex. Crim. App. 2009); *see Stokes v. State*, 277 S.W.3d 20, 21 (Tex. Crim. App. 2009) (explaining that purpose of presentment rule is to provide trial court with actual notice). "In addition, the presentment must be apparent from the record." *Aguilar v. State*, 547 S.W.3d 254, 265 (Tex. App.—San Antonio

2017, no pet.). Presentment can be shown by proof of the judge's signature or notation on the motion or an entry on the docket sheet showing either presentment or setting a hearing date, *id.*, and requires "some documentary evidence or notation that the trial judge personally received a copy of the motion and could therefore decide whether to set a hearing or otherwise rule upon it," *Gardner*, 306 S.W.3d at 305. Merely timely filing the motion "is insufficient to show that the motion was timely presented." *Harris*, 668 S.W.3d at 92.

Although the record in this case shows that the motion for new trial was filed, nothing in the record indicates that the motion for new trial was presented to the trial court. "There is no entry on the district court's docket sheet regarding the motion for new trial, no hearing was set or held, there is no signature by the judge on the motion, and there is no indication in the record that the court had actual knowledge that the motion for new trial was filed." *See McGoldrick v. State*, No. 03-07-00132-CR, 2007 WL 2462035, at *2 (Tex. App.—Austin Aug. 29, 2007, no pet.) (mem. op., not designated for publication).

For these reasons, we conclude that Schlett failed to preserve these claims for appellate consideration. *See Davis v. State*, 614 S.W.3d 223, 232, 233 (Tex. App.—Texarkana 2020, no pet.) (overruling defendant's issue asserting that his sentence was grossly disproportionate to offense because he failed to present motion for new trial making that argument to trial court); *see also Means v. State*, 347 S.W.3d 873, 874 (Tex. App.—Fort Worth 2011, no pet.) (concluding that defendant did not preserve complaint that his sentences were excessive even though "he complained about the length of his sentences in his motions for new trial" because "he did not present either motion to the trial court"); *Thompson v. State*, 243 S.W.3d 774, 775, 776 (Tex. App.—Fort Worth 2007, pet. ref'd) (determining that defendant failed to preserve challenges to length of his sentence on due process and other grounds by

27

failing to object when sentence was imposed or present motion for new trial containing his claims to trial court). Accordingly, we overrule Schlett's fifth and sixth issues on appeal.

## CONCLUSION

Having overruled Schlett's issues on appeal, we affirm the trial court's judgments of conviction.

_____
Thomas J. Baker, Justice

Before Justices Baker, Triana, and Smith

Affirmed

Filed: January 12, 2024

Do Not Publish